# RECEIVED

JUL 08 2019

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**UNITED STATES DISTRICT COURT**
**DISCTRICT OF MINNESOTA**

Court File No. 19cv1777 JNE/DTS

Lee Pederson,

     Plaintiff,

vs.

Phillip Frost, CoCrystal Pharma, Inc.,

and Daniel Fisher,

     Defendants

**COMPLAINT**

Jury trial demanded

## COMPLAINT

CONTENTS

I. Summary of the Case / Nature of the Action ........................................ 2

II. Parties and related persons .............................................................. 8

III. Jurisdiction, Venue and Standing ..................................................... 9

IV. Facts Common to All Claims ............................................................ 11

    A. General background .................................................................. 11

    B. Fisher's Garcia Properties mortgage ........................................ 13

    C. Timeline of Events - Exposing the Frost gang ........................ 17

1

SCANNED
JUL 08 2019
U.S. DISTRICT COURT MPLS

D.  The Fisher Settlement with CoCrystal ...................................... 38

V.  The Frost gang Saga Continues .............................................. 44

VI.  My Battle Against a Billionaire ............................................. 51

VII.  Intentionally left blank .................................................... 69

VIII.  Claims................................................................... 69

IX.  Prayer for Relief ......................................................... 74

## I.  SUMMARY OF THE CASE / NATURE OF THE ACTION

1.  This lawsuit is one of many lawsuits involving a white-collar gang led by

billionaire Phillip Frost. (999)  The Frost gang specializes in market manipulation

and securities frauds, especially pump and dump (P&D) securities frauds.  Since

about 2011, members of the gang have been involved with frauds at numerous

publicly traded corporations.

2.  In pursuing and concealing their securities frauds and related activities,

members of the Frost gang have committed various other frauds and offenses along

the way.  The present case is an example of Defendant Frost misusing corporate

assets to buy the silence of a person (Defendant Fisher) who has damaging

information about the gang's fraudulent activities.  In executing his attempted

cover-up, Defendant Frost committed both a breach of duty against Defendant

corporation CoCrystal (COCP) and a tort against the Plaintiff.

3.  For many years, Frost and his gang operated with impunity.  Federal law enforcement agencies (SEC and DOJ) mostly left them alone.  Journalists and business writers were silenced by litigation and threats of litigation.  Victims were silenced by armies of Frost gang lawyers.

4.  On September 7, 2018, the SEC filed a Federal civil securities fraud case against 10 individuals and 10 entities associated with the Frost gang.  The suit alleged P&D securities frauds at three separate companies, including BioZone (the precursor company to Defendant CoCrystal - ticker symbol COCP).[1]  Frost was named as a defendant, as were three entities owned and/or controlled by Frost.  Frost consented to judgment and paid over $5.6 million in penalties, disgorgement and interest. (004)

5.  Since the September 7, 2018 filing of *SEC v Honig et al*, the floodgates of litigation have opened against Frost, other Frost gang members and associates, and Frost gang companies.[2]

_____

[1] In addition to alleging fraud at Defendant CoCrystal (COCP), the SEC alleged that Frost gang members committed P&D frauds at MGT Capital Investments (MGTI) and MabVax Pharmaceuticals (MBVX).

[2] Examples of new Frost gang litigation include: Numerous class action suits were filed against Defendant CoCrystal (COCP) and then consolidated into one case. Numerous class actions were filed against Opko (OPK) and then consolidated into one case.  Other lawsuits alleging various frauds at Frost gang companies MabVax (MBVX) and PolarityTE (PTE) were filed.  Defendant Frost was named as a defendant in some of the above cases, as well as in another case alleging frauds at other Frost gang companies including RIOT Blockchain (RIOT) and VBI Vaccines (VBIV).  There are additional cases not mentioned here.

6.  Both Plaintiff Lee Pederson and Defendant Dan Fisher were harmed financially when Frost and his gang took control of a company formerly known as BioZone (now Defendant CoCrystal, or "COCP") for the purpose of a P&D securities fraud. After the P&D, Pederson and Fisher worked together with each other under a general collaborative agreement to help each other seek redress for the harms caused to them by Frost and his gang. The details of the agreement between Pederson and Fisher were never finalized because of the uncertain nature of the outcome.

7.  During the collaboration, Pederson provided Fisher with the benefits of a variety of work produced by Pederson, including some legal work, but mostly comprising business and scientific research and analysis, as well as communicating the research and analysis to third parties. Pederson and Fisher promised to mutually provide documents and testimony to support each other's legal claims against the Frost gang.

8.  Pederson's and Fisher's desired outcomes included criminal prosecutions and convictions of Frost and his gang members, publication of descriptions of Frost gang frauds and crimes, monetary awards from civil litigation against Frost and other gang members, monetary awards from SEC whistleblower complaints, and court-ordered restitution from Frost gang members.

4

9. Pederson and Fisher used a three-prong strategy against the Frost gang: (a) civil litigation, (b) supplying Federal law enforcement agents with research, information and evidence about the Frost gang's frauds, and (c) providing information to journalists and business writers.

10. By working together, Pederson and Fisher were highly effective against the Frost gang. They both put in long days, working at all hours every day of the week. They pored over SEC filings, news articles, and other information on the internet. They brainstormed on leads and chased down many (at least temporary) dead ends. Eventually their joint efforts resulted in active investigations of the Frost gang by the SEC and DOJ (FBI and U.S. Attorney's Office). They also aided a network of journalists and business writers who wrote and published stories about the gang's activities. Fisher's civil litigation against the gang put additional pressure on the gang.

11. The Frost gang saw the joint efforts of Pederson and Fisher as a threat. To ease this threat, they offered Fisher a deal behind Pederson's back. Fisher's deal with the Frost gang was negotiated by Fisher's attorney Chris Cella. Frost used various agents, attorneys, and entities (including Defendant CoCrystal) to carry out his role in the tort described in this complaint.

12.  Frost exerted his control over Defendant COCP to cause COCP to provide a benefit of about \$800,000[3] to Fisher at the expense of COCP shareholders, including Pederson.  This was done by COCP writing down the value of a mortgage from Fisher to COCP (the "Fisher mortgage" or the "Garcia Properties mortgage") by \$1,176,000.  The \$800,000 benefit to Fisher was intended to buy Fisher's silence and stop Fisher's collaboration with Plaintiff Pederson.

13.  Instead of following through with his general agreement with Pederson, Fisher went behind Pederson's back and settled his litigation against the Frost gang with a deal that unjustly enriched Fisher by an amount of about \$800,000 while selling out Fisher's promises to Pederson.  Fisher profited financially from the deal, and Frost temporarily profited by making Pederson's efforts to seek redress against Frost and his gang much more difficult.

14.  Through these financial transactions, Frost essentially used COCP's assets to buy Fisher's silence and thereby impede Pederson's efforts to seek justice against Frost and his gang.

15.  The \$800,000 benefit to Fisher was provided by Frost and COCP so that (a) Fisher would stop his collaboration with Pederson; (b) Fisher would stop

---

[3] The exact amount of the benefit depends on factors unknown to Plaintiff and will have to be determined at trial.  Whatever the exact amount, the amount will usually be referred to as the "\$800,000 benefit" or the "\$800,000 pay-off" in this complaint.

communicating with Pederson; and (c) Fisher would withdraw his complaints to the SEC and DOJ about the Frost gang.

16. By using COCP's assets to cause Fisher to renege on his agreement with Pederson for a settlement amount about $800,000 greater than the amount of Fisher's claim, Defendants Frost and CoCrystal tortiously interfered with Pederson's business relationship with Fisher.

17. By using COCP's assets to cause Fisher to renege on his agreement with Pederson for a settlement amount about $800,000 greater than the amount of Fisher's claim, Defendant Frost breached his duty to COCP shareholders, including Pederson.

18. By accepting the $800,000 pay-off from Defendant COCP in exchange for reneging on his general agreement with Pederson, Fisher was unjustly enriched at the expense of Pederson.

19. Pederson brings claims against Frost for breach of fiduciary duty and tortious interference with a prospective economic advantage. Pederson brings a claim against CoCrystal ("COCP") for tortious interference with a prospective economic advantage. Pederson brings claims against Fisher for unjust enrichment / quasi-contract and quantum meruit.

20. The present lawsuit ("*Pederson v Frost II*" or "pvf2") is related to an existing case entitled *Pederson v Frost et al.* ("*Pederson v Frost I*" or "pvf1"). Records for

pvf1 are at District of Minnesota Court File No. 17-cv-5580-WMW/BRT, and the

case is now on appeal to the Eighth Circuit Court of Appeals (Appeal no. 18-

3195).  Pvf1 and pvf2 share common issues of fact and common parties.  Plaintiff

intends to move to consolidate pvf2 with pvf1 under FRCP 42 if and when pvf1 is

returned to the district court for further proceedings.

## II. PARTIES AND RELATED PERSONS

21.  Plaintiff Lee Pederson is a resident of Minneapolis, MN.

22.  Defendant Phillip Frost is a resident of Florida.  Frost is the head of the Frost

gang, a white-collar gang that specializes in market manipulation and securities

fraud.  Frost is CEO, largest shareholder and chairman at Opko Health, Inc. (OPK).

Frost is on the Board of Directors of COCP.  Frost exerts additional control over

COCP via ownership of shares.  Frost exerts additional control over COCP via

share ownership by Opko.  Frost exerts additional control of COCP through Frost

gang members Steve Rubin and Jane Hsaio.

23.  Defendant COCP is a Delaware corporation with its principle place of

business in Georgia.  COCP was formerly known as BioZone Pharmaceuticals, Inc

(ticker symbol: BZNE), and before that as BioZone Laboratories, Inc.

24.  Related person Steve Rubin is a resident of Florida.  Rubin is a member of the

Frost gang.  Rubin is an officer and director at Opko.  Rubin is a director at COCP.

8

25. Related person Jane Hsaio is a resident of Florida. Hsaio is a member of the

Frost gang. Hsaio is an officer and director at Opko. Hsaio is a director at COCP.

26. Defendant Daniel Fisher is a resident of California. Fisher was a founder of

BioZone Laboratories, Inc. (now COCP).


### III. JURISDICTION, VENUE AND STANDING

27. This District Court of Minnesota has diversity jurisdiction over this case

pursuant to 28 U.S. Code § 1332 because the parties are citizens of different States

and the amount in controversy exceeds the value of $75,000.

28. The Minnesota long arm statute says:

> 543.19 PERSONAL JURISDICTION OVER NONRESIDENTS.
> Subdivision 1. Personal jurisdiction.
>
> As to a cause of action arising from any acts enumerated in this
> subdivision, a court of this state with jurisdiction of the subject matter
> may exercise personal jurisdiction over any foreign corporation or any
> nonresident individual, or the individual's personal representative, in
> the same manner as if it were a domestic corporation or the individual
> were a resident of this state. This section applies if, in person or
> through an agent, the foreign corporation or nonresident individual:
>
>     (1) owns, uses, or possesses any real or personal property situated
> in this state; or
>
>     (2) transacts any business within the state; or
>
>     (3) commits any act in Minnesota causing injury or property
> damage; or
>
>     (4) commits any act outside Minnesota causing injury or property
> damage in Minnesota, subject to the following exceptions when no
> jurisdiction shall be found:

(i) Minnesota has no substantial interest in providing a forum; or

(ii) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice.

29.  Frost is subject to personal jurisdiction in Minnesota under the Minnesota long arm statute by having committed acts outside Minnesota causing injury or property damage in Minnesota.

30.  COCP is subject to personal jurisdiction in Minnesota under the Minnesota long arm statute by having committed acts outside Minnesota causing injury or property damage in Minnesota.

31.  Fisher is subject to personal jurisdiction in Minnesota under the Minnesota long arm statute by having committed acts outside Minnesota causing injury or property damage in Minnesota.

32.  All Defendants acted in person and through agents and attorneys when committing acts outside Minnesota causing injury or property damage in Minnesota.

33.  All Defendants acted in person and through various conspiracies when committing acts outside Minnesota causing injury or property damage in Minnesota.

34.  Venue is proper in Hennepin County because Plaintiff is a resident of Hennepin County.

35.  Plaintiff Pederson has standing to bring his claims for tortious interference, quasi-contract/unjust enrichment, and quantum meruit as a person who has suffered substantial harm from those claims.

36.  Plaintiff Pederson has standing to bring a claim for breach of duty against Frost as a COCP shareholder.

## IV.  FACTS COMMON TO ALL CLAIMS

### A.  General Background Information

37.  The facts of this highly complex case stretch over a period of many years. Many important background facts are recited in the Amended Complaint for another case captioned *Pederson v Frost et al.* (0:17-cv-05580-WMW (D.Minn.)). (001)  The cited case is referred to herein as "*Pederson v Frost I*" or "pvf1".  The present case is referred to herein as "*Pederson v Frost II*" or "pvf2".  Pvf1 is currently on appeal.  The district court file and the 8th Circuit Court of Appeals file (Appeal No. 18-3195) for pvf1 contain further information.

38.  Other background information is contained in the court file for *Fisher v BioZone et al* (3:12-cv-03716 (N.D.Cal.)).  This case is referred to herein as the "Fisher Federal litigation".

39.  Other background information is contained in the court file for *580 Garcia Properties v BioZone et al.* (MSC14-00754, (California Superior Court, Contra

Costa County)).   This case is referred to herein as the "Garcia Properties litigation".  The July 23, 2015 Meet and Confer letter from the Garcia Properties litigation (the M&C letter) is especially informative.  (002)

40.  Other background information is contained in the court file for *SEC v Honig et al* (SDNY), which was filed on September 7, 2018. (003a)  An amended complaint was filed on March 8, 2019 (003b)  Defendant Frost has consented to judgment in *SEC v Honig et al*. and paid disgorgement plus a $5,000,000.00 (five million dollars) fine, for a total of over $5.6 million. (004)   This case is referred to herein as "*SEC v Honig*".

41.  Still further background information on the alleged activities of Frost and other gang members is contained in the public court files for numerous other lawsuits. (999)

42.  In this document, the name "BioZone" is meant to refer to the company cofounded by Defendant Dan Fisher, as well as the legal successors to that company.  "BZNE" is a subset of the term "BioZone" and refers specifically to the public company that traded under that ticker symbol from 2011 until the ticker was changed to COCP in early 2014.  Currently, Defendant Cocrystal Pharmaceuticals, Inc. (CoCrystal or COCP) is the successor entity to BioZone.

43.  This lawsuit and other related events relate to a company formerly known as BioZone (now Defendant CoCrystal).  A series of frauds at BioZone was instigated

by billionaire Phillip Frost and his gang.  Therefore, Plaintiff Pederson refers to the

BioZone / Frost / Fisher situation described in this complaint as FrostZone.

44.  Note:  Much of the context needed to understand the events described in this

complaint is outlined in the lawsuits listed above.  It is therefore recommended

that, before reading the details in this complaint, the reader first read the amended

complaint in *Pederson v Frost I*, which is available online at

https://www.scribd.com/document/374185521/Pederson-v-Frost-amended-

complaint-filed-February-14-2018 and the amended complaint in *SEC v Honig*,

which is available online at

https://www.sec.gov/litigation/complaints/2019/comp24431.pdf.

45.  Because of ongoing investigations, and with the exception of former SEC

Whistleblower Office Chief Sean McKessy, the names of Federal law enforcement

agents (LEAs) are being withheld from this complaint.  The following name

indicators may be used for individual LEAs throughout this complaint:  SEC-1,

SEC-2, SEC-3, SEC-4, SEC-5, SEC-6, SEC-7, FBI-1, AUSA-1, and AUSA-2.


B.  FISHER'S GARCIA PROPERTIES MORTGAGE (the "Fisher mortgage")

46.  Defendant Dan Fisher and Brian Keller (Keller is a Defendant in *Pederson v

Frost I*) founded BioZone Laboratories, Inc. in about 1989.  BioZone was mainly a

manufacturer of health care and skin care products.  By about 2005, Fisher

purchased the land and buildings where BioZone's manufacturing operations were carried out (Garcia Properties). This purchase was done through an entity (580 Garcia Properties LLC) that Fisher and his wife Sharon owned and controlled. Fisher financed the purchase with a mortgage. 580 Garcia Properties leased the property to BioZone.

47. After Frost and his gang fraudulently took control of BioZone, Fisher was fired from BioZone in early 2012. Fisher sued BioZone and members and associates of the Frost gang in 2012.

48. Fisher initially settled the Fisher Federal litigation around September of 2013. The P&D at BioZone began a couple weeks later.

49. The Frost gang then used insider deals to dispose of the assets of BioZone and restructure the company completely.

50. In early 2014, the situation looked like this:

a. Fisher and the Frost gang had come to an initial settlement in the Fisher Federal litigation.

b. BZNE had sold their manufacturing assets to another Frost gang company, MusclePharm Corporation (ticker symbol: MSLP).

c. BioZone had transferred their lease with Garcia Properties to MSLP.

d. BioZone was now operating as CoCrystal Pharma, Inc. (COCP) after a merger with yet another Frost gang company (CoCrystal Discovery, Inc.). Defendant

14

COCP was and is controlled by the Frost gang, with Defendant Frost and Frost gang members Rubin and Hsaio on the board of directors.

51. The lease transfer by the Frost gang intentionally put the Fisher mortgage into foreclosure. Despite have limited cash assets and no legitimate purpose for acquiring the Fisher mortgage, COCP (which was and is controlled by the Frost gang) bought Fisher's mortgage. Fisher believed that the Frost gang bought the mortgage for several reasons, including:

a. to exact revenge on Fisher for successfully suing them,

b. to exert leverage over Fisher by controlling both the rent payments to Fisher from MSLP and the mortgage owned by COCP, and

c. to possibly try to drive Fisher into financial ruin.

52. As a result of these perceived threats by the Frost gang, and to assert his right to collect $295,000 still owed to him after the initial settlement, Fisher initiated the Garcia Properties litigation.

53. The Garcia Properties litigation involved a $295,000 promissory note from BioZone to 580 Garcia Properties LLC, which was owned by Fisher and his wife Sharon. Fisher alleged that the promissory note debt was not satisfied by the initial settlement of the Fisher Federal litigation. Since COCP was the successor to BioZone, 580 Garcia Properties LLC sued COCP and others (including Frost) for satisfaction of the debt.

54. Events pertaining to the Fisher mortgage are described in more detail in a July

23, 2015 Meet and Confer letter from the Garcia Properties litigation. (002)  The

description of the Fisher mortgage situation appears on pages 37-38 of the M&C

letter:

> "The Frost Group's Attempted Revenge On Dan Fisher
>
> Members of the Frost Group have a variety of demented reasons to try to hurt Dan Fisher:
> - Mr. Fisher stood up to the Frost Group's "agree with me or sue me" policy, at great personal expense, and even after they thought that he did not have the stomach or the wallet to do it.
> - The first Fisher litigation likely delayed the onset of Phase 1 of the P&D fraud.
> - The Frost Group didn't want to pay Fisher the settlement money.
> - The Frost Group did not like the publicity or the SEC reporting requirements surrounding the first litigation and the whistleblower complaint filed by Fisher.
>
> The present lawsuit would not have happened if the Frost Group did not attempt to get revenge on Mr. Fisher.  Their FrostZone companies could simply have paid Fisher for the note and complied with the terms of the lease on the Garcia property.  Instead, they have refused to pay on the note, and they drove the mortgage on the property into potential foreclosure via a fraudulent conveyance.  What happened next is even more astounding and demented.
>
> When the lender issued a notice of default on the loan, then defendant COCP bought the note on the property at a price of almost a million dollars over the value of the property and without obtaining any discount from the lender.  That's right.  COCP had very little operating capital at the time, and they spent a large chunk of it so that the Frost Group would be both in the position of being the holder of Fisher's note (and potentially being able to foreclose) and in the position of Fisher's tenant (and potentially being in the position not paying rent to force a foreclosure).  From a pure business perspective, COCP's investment

was just plain nuts.  However, with Frost as the chairman of COCP at
the time, the motive behind the purchase of the note is perfectly clear."

55.  After protracted litigation, Fisher and CoCrystal eventually settled the Garcia

Property litigation as follows:

a.  COCP wrote down the book value of the Fisher mortgage by $1,176,000.  This

was done for the benefit of Frost and the Frost gang and at the expense of COCP

shareholders, including Plaintiff Pederson.

b.  Fisher paid off the reduced mortgage (presumably by obtaining a new mortgage

from another lender) and dropped his $295,000 claim based on the promissory

note.

c.  The settlement also included settlement of the re-opened Fisher Federal

litigation, Fisher's agreement to withdraw his complaints about the Frost gang with

the SEC and DOJ, and Fisher's agreement to discontinue his collaboration with

Pederson to expose the frauds of the Frost gang.

d.  As a result of the settlement, Fisher was unjustly enriched by about $800,000

and COCP's shareholders (including Plaintiff Pederson) were damaged.


## C.  TIMELINE OF EVENTS

56.  On about December 8, 2011, Fisher filed an SEC whistleblower complaint

against BZNE.  (005)

57. In about 2012, Fisher filed a Federal lawsuit against BZNE and members of the Frost gang (the "Fisher Federal litigation"). (006)

58. In 2012, Fisher established contact with FBI agent FBI-1. On or about September 5, 2012, Fisher made a formal presentation to FBI-1 about the beginnings of the frauds at BioZone. (007a) On or about January 8, 2013, the FBI provided Fisher with a "victim's letter" indicating that the FBI had opened a securities fraud investigation. (007b)

59. In 2013, Fisher settled his initial litigation (the Fisher Federal litigation) against the Frost gang. However, the Fisher Federal litigation was later reopened as described below due to a number of factors, including: (a) the BZNE P&D started after the settlement; (b) the Frost gang continued to harass Fisher even after the settlement (via the Garcia Properties mortgage); and (c) the settlement agreement included a non-disparagement clause that was raised as an issue by the Frost gang.

60. In 2013, after the initial settlement of the Fisher Federal litigation, the BZNE pump and dump began. The beginning of the BZNE P&D securities fraud is chronicled in both *SEC v Honig* and pvf1.

61. In 2013, the "Placebo Effect" article was published. (008)

62. In 2014, CoCrystal bought the mortgage on a commercial property owned by Fisher (Garcia Properties). As a result, Fisher felt a threat of retribution by the

Frost gang and explored legal options to protect himself. Fisher decided on filing lawsuits in California state court (the "Garcia Properties litigation").

63. In the course of the Garcia Properties litigation, Fisher's deposition was taken. During the deposition, COCP's attorney questioned Fisher about Fisher's relationship with Pederson. At the time of the deposition, Pederson and Fisher had not yet begun their collaboration against the Frost gang.

64. On about June 24, 2014 (after Fisher commenced the Garcia Properties litigation, and after Fisher's deposition was taken), Pederson emailed Fisher about FrostZone. (010)

65. By the time Pederson and Fisher re-established connection with each other, Fisher had started a second round of litigation (the Garcia Properties litigation) against the Frost gang. Fisher's first round of litigation (the Fisher Federal litigation) had been settled in late 2013 (before the BioZone P&D) with Fisher receiving about $2 million in the settlement.

66. The Garcia Properties litigation initially had two components, the "unlawful detainer" component and the "note" component. The unlawful detainer component was dismissed first, leaving the note component as the sole issue.

67. The note component involved a $295,000 promissory note from BioZone (later called COCP) to 580 Garcia Properties LLC (an entity owned by Fisher).

68.  Over the course of 2014, Pederson and Fisher re-established a connection with a goal of seeking redress against the Frost gang for the harm that Frost and his gang had caused to Pederson and Fisher.

69.  On about October 18, 2014, Fisher announced to his other attorneys that Pederson was a member of Fisher's legal team, along with Wes Paul and Jason Hoffman.  (011)  Wes Paul was Fisher's lead attorney in the Fisher Federal litigation.  At the time, Hoffman was Fisher's attorney-of-record in the Garcia Properties litigation.  Pederson assisted Fisher with the Garcia Properties litigation. However, the majority of Pederson's work was spent collaborating with Fisher on a broader goal of bringing Frost and his gang to justice.

70.  Fisher paid Pederson a total of about $10,500 for acting as Fisher's attorney. (012)

71.  The value of the benefits and services provided by Pederson to Fisher greatly exceeded the amount paid by Fisher.

72.  From 2014 to 2017, Pederson and Fisher worked together using the three-prong strategy against the Frost gang.  Pederson and Fisher worked together on all three aspects of the strategy: (a) civil litigation; (b) press coverage; and (c) Federal law enforcement.

73.  Pederson and Fisher began their collaboration with relatively scant material and evidence against the Frost gang, except for what they knew about the gang

from first-hand experiences regarding FrostZone. However, they had both been
harmed by the Frost gang, and they shared an absolute certain conviction that Frost
and his gang members were fraudsters and criminals.

74. Pederson and Fisher scoured the internet for additional evidence of Frost gang
activity. The most fruitful sources included (a) SEC filings of Frost gang
companies; (b) news stories and press releases about Frost gang companies; (c)
promotional articles on Frost gang companies; (d) message boards about Frost
gang companies; and (e) investigative stories on Frost gang companies.

75. Initially, Pederson and Fisher reported the results of their research to the SEC
via the Office of the Whistleblower. (013)

76. Pederson and Fisher sought to establish new contacts with federal law
enforcement agents, journalists, and others.

77. Slowly Pederson and Fisher began to develop a network of people who were
also interested in the nefarious activities of Frost and his gang. Pederson and
Fisher gradually developed a general understanding of how the Frost gang
conducted their P&D frauds at a variety of companies. Pederson's understanding
has continued to grow until the present day.

78. On or about November 5, 2014, Fisher filed an amended complaint in the
Garcia Properties litigation.

79. About November 9-11, 2014, Pederson established specific contact with DOJ

agents (FBI-1, AUSA-1 and AUSA-2) who were investigating the Frost gang.

(014)  At that point, Pederson began sending the results of Frost gang research

directly to the DOJ agents.

80. On March 25, 2015, Fisher sent an email to his legal team saying:

> "The only way for us to come out ahead in this case is to transfer the
> pain to the defendants. Otherwise, I am wasting my time and money.
> With the note case, the Frost Group has suffered no pain. Stalling,
> driving up our costs, and managing a slow moving case is the Frost
> Group's game plan, which we are now playing. They need to know
> that we are aggressively coming after them with broad discovery and
> an aggressive deposition schedule.  They need to know that we are
> threat to them since we will cooperate with the SEC and DOJ to
> damage them. And, we will have the cooperation of the press in
> researching and publishing the findings. This will allow us to take the
> offense. As of right now, they have the offense with their attempted
> foreclosure of the property (the UD case), not paying the $295,000
> note, and their associated profitable fraudulent activities." (044)

81. After an initial meeting with attorney Chris Cella on March 30, 2015, Fisher

wrote to Cella:

> "You said that criminals like these guys know it is cheaper to litigate
> than pay legitimate debts. We need to transfer the pain. So far they
> have been on the offense. You will find very few cases with the
> overwhelming evidence that we have compiled. They will not settle
> until they feel extreme pain and a risk for proceeding to depositions
> and a trial. We need a fair settlement, payment of the taxes owed to
> the IRS (they are going after me for BioZone's taxes - $300K), and
> payment of our legal expenses. The last settlement with these guys,
> for my 6,650,000 shares, they paid me $0.15 per share, and sold them
> very quickly for an estimated $0.60 to $0.80/share. They will not get
> away with a cheap settlement on this case. However, as you suggested

about Barry's nephew, I don't want prolonged litigation. They have
more to lose than we do. They are extremely cheap, hate to lose,
facing criminal prosecution, and adverse PR. As the case progresses,
more of their criminal acts will be exposed which is newsworthy."
(045)

82. On April 6, 2015, Frost was served as a defendant in the Garcia Properties

litigation.

83. Frost gang company MusclePharm (MSLP) had been closely involved with the

BZNE P&D, as described in the amended complaint for Pederson v Frost I. (001)

MSLP came under SEC investigations for separate violations than the BZNE P&D.

Pederson supplied voluminous information about the BZNE/MSLP P&D to SEC-

7, who was investigating MSLP.  (015)

84. On or about April 13, 2015, MSLP announced that it had reached a proposed

settlement with the SEC to resolve their SEC investigation.  (016)  The proposed

settlement did not address MSLP's role in the BZNE P&D.  The proposed

settlement was subject to final approval by the SEC.

85. On or about May 13, 2015, Justin Hoffman sent a 35-page meet-and-confer

letter to the Defendants in the Garcia Properties litigation.  The letter outlined

details of the P&D fraud at BZNE and other information about the Frost gang.  On

July 23, 2015, this letter was expanded to 42 pages.  (002)

86. Between about June 1 and mid-August of 2015, Pederson had a series of direct

contacts with individuals at the SEC Office of the Whistleblower.  These contacts

included a conference call with Whistleblower Office staff (SEC-4 and SEC-6) to

discuss Pederson's whistleblower claims regarding the Frost gang, BZNE and

MSLP. (017)

87.  As a result of Pederson's and Fisher's research and newly available

investigative publications, by mid-2015 it was apparent that the Frost gang fraud

network was spread across many companies and included dozens of Frost gang

members and associates. (018)

88.  On July 21, 2015, an anonymous writer calling themselves the "Pumpstopper"

wrote a negative article on Frost gang company IDI.

89.  The next day, July 22, 2015, a rebuttal to the Pumpstopper article appeared.

The article featured an interview with Michael Brauser, the IDI CEO who was a

core member of the Frost gang.   In the article, Brauser libeled Fisher, saying:

> "By way of example, Dr. Frost introduced me to BioZone
> which is mentioned in the body of the article.
> BioZone had some technology he was interested in.
> We closed on the company and bought it.
> And as we dove further into the company we found that the
> founder had misrepresented tremendous amounts about the company
> including a lot of liabilities, the ownership of the technology and his
> position within the company.
> He was eventually removed from the company, was quite bitter
> about that, and started to throw out multiple lawsuits, throwing out
> allegations against Dr. Frost, and everyone associated with him.
> The long and short of it is we ended up in federal court where
> he lost his claims, he was bought out of his stock at a nominal amount,
> and had no further claims to pursue against the company.

So, from my position he lost because he sued for 10s of millions of dollars and ended up walking away with something less than a millions dollars.

E: And none of the allegations proved true?

BRAUSER: None of the allegations.

He went to every investigative body he could trying to stir up as much trouble.

He then tried to sue everyone associated with it.

In fact, he attempted to blackmail Dr Frost and myself by having a friend of his who's a writer for a very well known magazine threaten to publish a negative article.

I was able to get him to put that in writing that he would kibosh that article if we'd pay him a certain amount of money.

I showed that to the federal judge in court in SF and really set him back quite a bit and got him into a bit of trouble.

Further to that, the company BioZone has now become a company called Cocrystal (COCP).

It has a large market cap. The stock rose from $0.15 to $1.15. It trades with good volume, and they have significant science and scientists involved with it.

So, there was a story that this author of this article (anonymous blog) tries to show that we were bad guys and stole the company and did all these horrible things.

In fact, we saved the company and created significant shareholder value.

So that's just one example.

I've been working with Dr Frost for a long time. He's obviously a man of very significant character."
https://www.valuewalk.com/2015/07/idi-ceo-responds-to-pump-stopper-short-thesis/


90. Pederson read countless SEC filings from Frost gang companies. On or about July 28, 2015, Pederson discovered that business writer John Ford was named in a list of "selling shareholders" in a registration statement (RS) filed by MGT Capital (MGTI). (019) Pederson recognized Ford as the writer of the key pump article in

the BZNE P&D fraud.  This connection was a key development in the Frost gang investigation, because it linked Frost gang P&Ds at BZNE and MGTI.  Eventually, the BZNE and MGTI P&Ds were used as the basis for the first SEC civil action against the Frost gang (*SEC v Honig*).  Pederson transmitted the information connecting BZNE, Ford and MGTI to federal law enforcement agents on July 29, 2015.  (020)

91.  On July 31, 2015, Pederson sent Fisher an invoice pointing out the value of Pederson's services to Fisher. (046)  Fisher did not pay the invoice.

92.  On August 24, 2015, SEC Whistleblower Chief Sean McKessy called Pederson at 2:13 pm central time from phone number 202-551-2000.  The call lasted 12 minutes and 49 seconds.  McKessy informed Pederson that the SEC would not take any action based on Pederson's whistleblower complaints.  Pederson requested that McKessy put that in writing and McKessy refused.  McKessy refused to comment on Dan Fisher's whistleblower complaint.  The conversation ended when Pederson told McKessy, "This is far from over."  (021)

93.  On September 8, 2015, MSLP announced that it had reached a final settlement with the SEC.  The settlement did not mention MSLP's involvement with the BZNE P&D.  (022)

94. On or about September 31, 2015, a second amended complaint was filed in Garcia Properties litigation after the deadline was almost missed. (047) Frost and Opko were added as defendants.

95. On or about October 5, 2015, FBI-1 told Fisher that the SEC was investigating the Frost gang.

96. On or about October, 8, 2015, Fisher met with agents of the SEC (SEC-1 and SEC-2) while under subpoena. Fisher then connected Pederson with one of the SEC agents (SEC-1).

97. On or about October 12, 2015, Pederson began a series of communications with SEC-1, providing voluminous and detailed information on the frauds of the Frost gang, including the P&D fraud at BZNE. (023)

98. Once contact was established with SEC-1, all research results, information and analysis from Pederson were provided by email to specific individuals at the DOJ and SEC. Much of this information was not communicated to the SEC Office of the Whistleblower, as it seemed futile or even counterproductive given the phone call from McKessy.

99. On or around October 19, 2015, Pederson's collaboration with Fisher became less intense as attorney Chris Cella began taking the leading role in Fisher's Garcia Properties litigation, replacing Jason Hoffman. However, Pederson and Fisher remained in close contact to pursue their three-prong strategy.

100.  On or about October 22, 2015, Pederson and Fisher emailed and discussed their mutual agreement to pursue the Frost gang. (024)

101.  In October of 2015, the SEC served COCP (fka BZNE) with a subpoena. (025)  This was about two months after SEC Whistleblower Chief McKessy told Pederson that the SEC would not pursue Pederson's whistleblower complaints. The subpoena seemed to be a direct result of the new contacts between Fisher, Pederson and the SEC.

102.  On or about November 2 of 2015, Fisher received an offer to settle the Garcia Properties litigation for $250,000.  Fisher reported to Pederson that the offer came about in conjunction with a conference call that included Fisher, Fisher's wife Sharon, Fisher's attorneys Hoffman and Cella, and two attorneys for COCP (Linscott and Sherman).  After that conference call, Pederson and Fisher then had further discussions about this settlement offer and the Pederson/Fisher collaboration.

103.  On or about November 25, 2015, Fisher told Pederson that Fisher had verbally agreed to settle his litigations for $175,000.

104.  On or about December 1, 2015, Fisher provided Pederson with a draft of the proposed $175,000 settlement agreement.  (026a, 026b)  The draft settlement agreement included overbroad release language that appeared to be intended by the Frost gang as a potential argument to limit Pederson's claims against Frost gang

members.  Pederson objected to this language and this attempt at settlement did not
go through.

105.  The late 2015 settlement negotiations illustrate the dilemma Fisher faced in
trying to resolve his issues with the Frost gang.

a.  After years of disputes, Fisher and his wife Sharon wanted resolution so they
could move forward with their lives.

b.  The Frost gang wanted to continue with their frauds, which required covering
up their old frauds, so they wanted resolution with Fisher, also.

c.  Fisher's two main sources of leverage against the Frost gang were Fisher's
collaboration with Pederson, and Fisher's Garcia Properties litigation (which
Pederson had salvaged).

d.  The lack of law enforcement action against the Frost gang, and the possibility
that the Feds would never take any enforcement action, caused doubts for Fisher,
for Fisher's attorneys, and for others who might otherwise have been of assistance
to Fisher's cause.

e.  The Frost gang were worried about the threat Pederson posed to them, and they
wanted to undermine Pederson in any settlement with Fisher.

f.  Fisher had obligations to Pederson according to their mutual understanding.

g.  Pederson was not ready to settle with the Frost gang.

106. Given these limitations, Fisher continued with the Garcia Properties

litigation, Cella continued to negotiate with the Frost gang on behalf of Fisher, and

Fisher and Pederson continued their collaboration.

107. On or about December 7, 2015, Fisher sent an email (with attachments) to

agents at the DOJ and SEC, labeling the Frost gang as "White Collar Terrorists."

(027a, 027b)  Fisher wrote in his email:

> "The Frost Group is applying white collar terrorism against me
> as the price for litigating against them and cooperating with the SEC
> and the FBI. Please read this to see the Affidavit (Cocrystal
> Settlement Agreement) they are demanding that I execute to avoid
> financial ruin. Signing this, which I will never do, will seriously
> damage your investigation. ...
>
> "I sued them (attached) over an unpaid $295,000 promissory
> note. We are now offering to settle the lawsuit with them. Most of the
> terms can be worked out. But, a major issue is that they insist that I
> recant my testimony, statements, and documentary evidence relating
> to the Frost Group and the companies that they invest. I have provided
> the SEC and FBI factual information. To settle, they are demanding
> that I perjure myself by agreeing to execute an Affidavit (Attachment
> A of the Settlement Agreement) recanting the information provided
> by me. I informed them that I would not do this since the information
> provided the SEC and FBI, to the best of my knowledge, is accurate. I
> will never agree to recant 4 years of my investigation, Lee Pederson's
> investigation, and the hard work of the SEC and FBI. However,
> Cocrystal (Frost Group company), is threatening to foreclose against
> 580 Garcia (me) since I won't agree to the Affidavit and the
> intentional fraudulent actions of the Frost Group companies. ...
>
> "My attorney [Cella] has recommended that I should drop my
> litigation ASAP and try to walk away from the Frost Group. However,
> the Frost Group will not let me do this without them extorting $500K
> to $1MM and deeding the property to them which will cost me over

> $1.5MM. The Frost Group's unchecked financial terrorism will ruin me."

108. In December of 2015, Fisher reported to Pederson that Fisher had spoken with both FBI-1 and SEC-1, and that FBI-1 had flown to New York to meet with SEC-1 about the case.

109. On December 23, 2015, Fisher received another subpoena about FrostZone.

110. Pederson and Fisher connected with business writer Chris Carey (aka Sharesleuth) in late 2015. (028)  Carey worked with billionaire Mark Cuban on a venture (sharesleuth.com) intended to profit by short-selling public companies in connection with exposing frauds and weaknesses in their businesses.  Pederson provided Carey with much of the same information provided to federal law enforcement agents.  In return, Carey sometimes provided useful information from his own research.

111. From 2015 onward, Carey repeatedly told Fisher and Pederson that he would soon publish an article exposing the Frost gang, but the promised article was always delayed.  Carey's excuses and delays became a running joke between Fisher and Pederson. (Note: Carey did not publish any story on the Frost gang until March 6, 2018.)

112.  By the end of 2015, Pederson and Fisher were both hopeful that the SEC would quickly take enforcement actions and that the FrostZone saga would soon be resolved.  However, that was not to be.

113.  On January 16, 2016, Pederson received a phone call from another person who had been involved with BioZone.  This person told Pederson that they had received an SEC subpoena about FrostZone.

114.  In early 2016, the status of the Fisher/Pederson three prong strategy was:  (a) the Garcia Properties litigation continued, and Pederson was planning his own lawsuit against the Frost gang;  (b ) the SEC and FBI were investigating the Frost gang; and (c) Fisher and Pederson were continuing to interact with a network of people interested in the activities of the Frost gang.

115.  In June of 2016, Chris Drose (aka Bleecker Street Research) published an online story critical of Frost gang company Chromadex.  The same month Drose published another story critical of Frost gang company Pershing Gold. Around September, Drose published another story critical of Frost gang company Transenterix.  Then, litigation led by Frost gang member Barry Honig eventually forced Drose to take down the Pershing Gold story.

116.  Though Fisher and Pederson both knew from personal experience that Frost and his gang were fraudsters, they faced considerable obstacles in seeking justice, including:

CASE 0:19-cv-01777-JNE-DTS   Document 1   Filed 07/08/19   Page 33 of 75

(a)  In October 2016, Forbes estimated Frost's net worth to be about $4.1 billion.

(b)  Frost was a prolific philanthropist, with various institutions bearing his name, including The Phillip and Patricia Frost Museum of Science in Miami, The Patricia & Phillip Frost Art Museum in Miami, and The Phillip and Patricia Frost School of Music in Miami.

(c)  Frost was the CEO and Chairman of Opko Health, Inc. (OPK).

(d)  Frost was a director at other public companies, including being the chairman of Ladenburg Thalmann (LTS), an investment bank.

(e)  Frost gang members and associates (including Rubin and Hsaio) were on the boards of many public companies.

(f)  Frost gang members and associates (including Rubin and Hsaio) were employed as officers at many public companies.

(g)  Frost's wealth, reputation and network give him enormous influence and control over many public companies, including influence and control over the use of corporate assets (i.e., other peoples' money).

(h)  Frost's influence and control appeared to extend to many other aspects of the securities and investment environment, including hedge funds, market makers, investments banks, broker/dealers, public relations firms, business journalists, bloggers and internet trolls, and mainstream media.

(i)  Frost and his gang members had an extensive legal team to defend them from their victims and critics.

(j)  Federal law enforcement authorities had been reluctant to pursue Frost and his gang members in spite of overwhelming evidence of frauds at numerous companies.  As of 2016, there were no Federal law enforcement actions against Frost and his gang members for P&D securities frauds.

(k)  As of 2016, Frost and his gang members were continuing to initiate new apparent P&D securities frauds.

(l)  As of 2016 (over two years after the BioZone P&D securities fraud began), the SEC had not taken formal enforcement action against the Frost gang for the BioZone fraud, in spite of the availability of overwhelming evidence of fraud.

(m)  Pederson and Fisher understood that it was difficult for a normal person to fathom how or why Frost would be involved in such dishonesty, fraud and corruption.  Even though Fisher and Pederson were both victims of Frost's frauds, it had taken about a year for each of Fisher and Pederson to be convinced that Frost is a fraudster.  Therefore, they understood how hard it was to convince non-victims that Frost is a fraudster.

(n)  As of 2016, it was not clear to either Fisher or Pederson that Federal law enforcement authorities would ever act against the Frost gang for their P&D frauds or other frauds related to the P&Ds.

117.  Fisher's and Pederson's efforts to battle the Frost gang were taking a serious toll on both men.  Most weeks, each of them worked over 60 hours on their battle. Both men were under financial strain, because they did not have time to pursue normal employment.  Though Fisher still had some of his $2 million settlement, he was paying large legal bills each month.  Both men were also under emotional strain.  Fisher's wife Sharon was also under severe emotional strain.

118.  On or about September 7 of 2016, journalist Teri Buhl published a story with a link to a Federal plea deal that linked Frost gang member Barry Honig to a P&D fraud.  (029)

119.  On or about September 23 of 2016, Buhl published a story referring to an SEC subpoena to MGTI.  (030)  MGTI was linked to BioZone by the John Ford connection, and the subpoena may have been the direct result of Pederson providing information to the SEC about that connection.

120.  On or about September 26 of 2016, Barry Honig sued Teri Buhl in an effort to silence her journalism.

121.  Fisher contacted Buhl on or about October 11, 2016.

122.  On or about November 8, 2016, Teri Buhl published an online story entitled, "California DOJ Investigating Honig and the Frost Group."  The article can be seen at: http://www.teribuhl.com/2017/02/09/california-doj-investigating-honig-and-the-frost-group-2/

123. The Buhl story was partly responsible for the reopening of the Fisher Federal litigation, where the Frost gang asserted that Fisher had violated the non-disparagement clause of the initial settlement agreement.

124. Beginning in about October 15 of 2015, Fisher's attorney Chris Cella had negotiated with the Frost gang to settle both the Fisher Federal litigation and the Garcia Properties litigation on behalf of Fisher. Fisher shared limited information about these settlement discussions with Pederson as negotiations continued through 2016 and into 2017.

125. In March of 2017, a hearing was held in the Frost Federal litigation. The two main issues were (a) whether COCP and the Frost gang could proceed against Fisher with foreclosure of the Garcia Properties mortgage, and (b) breach of the disparagement clause from the initial settlement of the Fisher Federal litigation.

126. Pederson's and Fisher's partnership was based on obtaining a total victory over Frost and his gang. As Fisher often put it, "They're not going to settle until they hear the jailhouse keys rattling." Therefore, when the Fisher Federal litigation reopened, Pederson urged Fisher to take an aggressive tack. Evidence available for Fisher to use included:

(a) Frost gang member Michael Brauser had initiated the public disparagement with defamatory statements against Fisher in an online story related to a company then called IDI.

https://realmoney.thestreet.com/articles/07/22/2015/idi-management-fires-back-against-blog-post

(b)  There was considerable communication between Fisher and Pederson and the DOJ and SEC about active securities fraud investigations to validate the truthfulness of the Buhl story.

(c)  Pederson was willing to submit a declaration attesting to the evidence of widespread frauds by the Frost gang and the existence of Federal investigations. (031)

127.  Pederson provided input to Fisher on both substance and strategy for the March 2017 hearing.  However, Fisher ignored Pederson's advice.  Despite the opportunity to deliver a possible knockout blow to the Frost gang in the Fisher Federal litigation, Fisher instead took a passive approach.  (032)

128.  On or about March 5, Fisher sent Pederson a summary of the hearing.  (033)

129.  On or about March 21, 2017, Pederson sent Fisher a draft complaint for *Pederson v Frost I* by email.  (036a, 036b)  Fisher responded by leaving Pederson a voicemail praising the draft complaint. (037b)  Fisher said:

> "Hey Lee, this is Dan.  Thanks for sending the draft over. Bravo.  This is a magnificent document.  Incredible actually.  ... It's long, but their offenses are long, extensive.  Please give me a call when you get a chance.  Kudos to you.  You've done a marvelous job. Fantastic job. ..."

130. On or about March 23/24, 2017, Magistrate Judge Beeler issued an order in the Fisher Federal litigation. (034) Fisher did not inform Pederson of the order.

131. On or about April 7, 2017, Fisher called Pederson and told Pederson that Cella wanted Pederson to resign as Fisher's attorney. Since there was no good reason to do so, Pederson told Fisher that he would not resign. Pederson reminded Fisher of their mutual agreement and made a counter proposal. Pederson told Fisher that Fisher could write an email firing Pederson as his attorney, and then Pederson would send Fisher a bill for Pederson's services. Fisher did not follow up on Pederson's counter proposal.

132. Several days later, Fisher called Pederson with another strange request. Fisher told Pederson that Fisher wanted Pederson to sign an unspecified back-dated document. Without even asking about the details, Pederson told Fisher that he was not going to play any kind of games of that sort.

133. At that point, the intense collaboration between Fisher and Pederson was essentially over, though Fisher and Pederson continued to exchange correspondence on occasion.

## D. The Fisher Settlement with CoCrystal

134. During settlement negotiations with Fisher, Defendant COCP wrote down the value of the Fisher mortgage on its books by $1,176,000 without reducing the

amount legally owed by Fisher. This approach allowed Frost and COCP to offer a financial inducement for Fisher to settle without any cash outlays by COCP or Frost or any of the other Garcia Properties litigation defendants.

135. Frost, Rubin and Hsaio were on the COCP board of directors, and the other directors were also associates of Frost.

136. By settling the Garcia Properties litigation, Frost and his gang members sought to avoid producing evidence of their frauds via discovery, and to avoid the negative publicity of a trial.

137. In an SEC Form 10-Q filed on November 9, 2016, and in preceding 10-Q filings, COCP listed the Fisher mortgage note as an asset worth $2,276,000.

138. In an SEC Form 10-K filed on March 31, 2017, COCP listed the Fisher mortgage note as an asset worth only $1,294,000.

139. Page F-11 of the March 31, 2017 10-K stated:

> *"Mortgage Note Receivable*
> The Company records its mortgage note receivable at the amount advanced to the borrower, which includes the stated principal amount and certain loan origination and commitment fees that are recognized over the term of the mortgage note. Interest income is accrued as earned over the term of the mortgage note. The Company evaluates the collectability of both interest and principal of the note to determine whether it is impaired. The note is considered to be impaired if, based on current information and events, the Company determines that it is probable that it would be unable to collect all amounts due according to the existing contractual terms. Upon determination that the note is impaired, the amount of loss is calculated by comparing the recorded investment to the value determined by discounting the expected future

cash flows at the note's effective interest rate or to the fair value of the Company's interest in the underlying collateral, less the cost to sell."

140. Page F-14 of the March 31, 2017 10-K stated:

"6. Mortgage Note Receivable
In June 2014, the Company acquired a mortgage note from a bank for $2,626,290 which is collateralized by, among other things, the underlying real estate and related improvements. The property subject to the mortgage is owned by Daniel Fisher, one of the founders of Biozone, and is currently under lease to MusclePharm. The mortgage note has a maturity date of August 1, 2032 and bears an interest rate of 7.24%.

In 2014, Daniel Fisher and his affiliate, 580 Garcia Properties LLC, brought multiple lawsuits against the Company involving its predecessors and subsidiaries. The lawsuits have been settled and the complaints initiating them dismissed, without the Company making any payments to either Mr. Fisher or 580 Garcia Properties LLC. In addition, the mortgage note discussed above is a promissory note secured by a deed of trust under which 580 Garcia Properties LLC is the primary obligor. As of the time of the acquisition by the Company of the promissory note, 580 Garcia Properties LLC, was delinquent in its obligation to make certain monthly payments thereunder. Consequently, in December 2015, the Company issued notice of default letters to 580 Garcia Properties LLC, Daniel Fisher, and Sharon Fisher for said delinquencies, and proceeded in accordance with rights of a secured real estate creditor under California law, to initiate private foreclosure proceedings respecting the property, to foreclose under the promissory note secured by the deed of trust. A foreclosure sale was set in accordance with California law for January 27, 2017. Prior to the date of this foreclosure sale, Mr. Fisher filed a motion where he sought among other things an order of the court enjoining the foreclosure sale, alleging wrongdoing by the Company and Biozone Pharmaceuticals, Inc. and others that Mr. Fisher claims the Company has direct responsibility over. The court in the Fisher/Biozone Lawsuit heard oral argument on Mr. Fisher's motion on March 2, 2017. On March 23, 2017, the court ordered further briefing by March 30, 2017 on the issue of whether to enjoin the

foreclosure sale. Since the filing of Mr. Fisher's motion the Company has voluntarily postponed the announced foreclosure sale several times from the original January 27, 2017 date and it is currently scheduled for April 28, 2017. There is no assurance that the sale date will not again be changed; that is highly dependent on proceedings in the Fisher/Biozone Lawsuit.

Because the Company intends to foreclose on the property and foreclosure is probable, the Company recognized an impairment on the mortgage note receivable of $1,176,000 to adjust the carrying value of the note to its fair value. The fair value of the note was determined by reference to the estimated fair value of the underlying property, which was determined based on analysis of comparable properties and recent market data. Furthermore, as a result of the Company's plan to divest of this asset within the next twelve months, the asset was reclassified from long-term to current."

141. Page F-15 of COCP's 10-Q filed with the SEC on November 9, 2018

describes the settlement of the Garcia Properties litigation with respect to the

Garcia Properties mortgage:

"Note 8 - Mortgage Note Receivable
    In June 2014, the Company acquired a mortgage note from a bank for $2,626 which was collateralized by, among other things, the underlying real estate and related improvements. The property subject to the mortgage was owned by an entity managed by Daniel Fisher, one of the founders of Biozone, the property was also under lease to MusclePharm. The mortgage note had a maturity date of August 1, 2032 and bears an interest rate of 7.24%.

    Shortly thereafter in 2014, Daniel Fisher and his affiliate, 580 Garcia Properties LLC (the primary obligor of the note), brought multiple lawsuits against the Company involving its predecessors and subsidiaries. The lawsuits were later settled and the complaints dismissed, without the Company making any payments to either Mr. Fisher or 580 Garcia Properties LLC. At the time of the note's acquisition, 580 Garcia Properties LLC was delinquent in its

obligation to make monthly payments. In December 2015, the
Company proceeded in accordance with rights of a secured real estate
creditor under California law, to initiate private foreclosure
proceedings. During 2017, the court enjoined the Company from
proceeding with the foreclosure sale pending further developments in
the litigation.

In February 2018, the Company, Daniel Fisher, and 580 Garcia
Properties LLC resolved all outstanding claims and disputes. As part
of this settlement, the Company received a payment of $1,400 [$1.4
million] in exchange for the release of the aforementioned note and
deed of trust." (035)

142. Pederson has not seen the settlement agreement between Fisher, COCP, Frost

and other Frost gang members, but the available evidence indicates that the

settlement agreement includes the following terms:

a. Fisher agreed to withdraw his complaints to the SEC and DOJ about the Frost

gang.

b. Fisher dropped his $295,000 claim against COCP.

c. Fisher paid off the Garcia Properties mortgage for about $1,176,000 less than he

owed on it.

d. Fisher agreed to stop his collaborations with Pederson, including refraining

from providing documents and testimony in support of Pederson's claims against

Frost and his gang.

e. Fisher agreed to stop communicating with Pederson.

143. The Frost gang and COCP used the elaborate scheme of writing down the amount of the Fisher mortgage note to induce Fisher to settle his litigation with the Frost gang and to thereby buy Fisher's silence.

144. As a result of this settlement, Fisher was unjustly enriched by about $800,000 at the expense of Pederson, and Frost misused about $800,000 of COCP's assets for his own personal benefit.

145. By the end of April of 2017, it was apparent to Pederson that Fisher intended to renege on his agreement to collaborate with Pederson in their efforts to battle the Frost gang. It was apparent that Fisher would no longer share information or documents with Pederson. It was apparent that Fisher did not intend to testify on Pederson's behalf once Pederson initiated litigation against the Frost gang. It was apparent that Fisher intended to settle, or had settled, with the Frost gang at the expense of Pederson. It was also apparent that Fisher's actions had given rise to and/or would give rise to legal causes of action by Pederson against Fisher.

146. Pederson continued his efforts against the Frost gang by himself after Pederson's collaboration with Fisher ended.

147. On June 20, 2018, Pederson emailed Fisher:

> "You and I had a deal, even if all the details weren't finalized. It is
> clear that you sold me out in order to settle your case. I understand
> why you did that, but you owe me. It looks like your settlement gave
> you about a million dollar reduction on your mortgage. I assume that
> you paid all the other lawyers in full. You paid Jason Hoffman how
> much? You paid Chris Cella how much? You paid Wes how much?

> You have paid me about 11-12 thousand dollars so far. Please come
> up with a number that you think is fair to settle things between us. I
> look forward to hearing from you." (038)

148.  On the same day (June 20, 2018), Fisher inadvertently sent Pederson an email

intended for business writer Chris Carey (aka Sharesleuth).  Fisher forwarded

Pederson's email to Carey and wrote:

> "I received this Lee Pederson email. Lee is attempting to milk us for
> money which we don't have. It is my feeling that he feels anxiety
> about the future of his case which is causing him to scramble to raise
> money. He points out that we have no engagement agreement.
> Normally I would ignore this request, and I want to have deniability
> of communicating with him. But, this request is coming from a guy
> that is nuts, and I have learned to be careful when negotiating with
> unpredictable crazies.  Do you think I should reply telling him that I
> wish him good luck, and remind him that we have no engagement
> agreement and no cash (the settlement provided no cash)? Or,
> continue to ignore him? Send him a few thousand dollars and tell him
> that's it? Much of his Minnesota case was supported by research that
> we paid for. If anything, he should have shared the litigation cost with
> us. Lee's legal advice was of no use, and it may have been harmful to
> our case." (039)

149.  Fisher's message to Carey was sent several months after Fisher had taken a

$800,000 pay-off from the Frost gang to renege on his promises to Pederson, and

several months before the SEC brought securities fraud charges against the Frost

gang in *SEC v Honig*.

## V.  THE CONTINUING FROST GANG SAGA

44

150. After the collaboration with Fisher ended, Pederson continued to work the three-prong strategy on his own. Pederson continued to prepare and pursue his own litigation against the Frost gang. Pederson continued to communicate with journalists and business writers. Pederson continued to communicate with Federal law enforcement agents at the SEC and DOJ.

151. Pederson continued to stay current on Frost gang developments. Pederson continued with his own research and analysis of the Frost gang activities. After the collaboration with Fisher ended, Pederson focused his research and analysis of the Frost gang on several specific areas:

(a) Frost gang companies that have exhibited red flags for new P&D frauds. PolarityTE (PTE, formerly COOL) has been of particular interest to Pederson.

(b) The depth and breadth of the Frost gang's reach, including individuals, companies, and other entities and players in the securities markets such as hedge funds, investment banks, broker/dealers, market makers, public relations firms, promoters, publishers, business writers, bloggers, and short sellers.

(c) Frost gang members and associates who use litigation and media to attack persons who seek to expose the Frost gang. Attacks against short sellers and business journalists who draw attention to possible P&D operations have been an especially hot area lately.

152. Pederson has continued to share his research and analysis with Federal law enforcement agents, journalists, business writers, and others who have been affected by the Frost gang.

153. On about April 26, 2017, Pederson emailed a copy of the draft complaint for *Pederson v Frost I* (a version of the draft complaint similar to the one sent to Fisher) to SEC-1. (036b, 036c)  SEC-1 sent a reply regarding the draft complaint by email to Pederson on April 28, 2017. (043)

154. The form and content of the complaint and the amended complaint in *SEC v Honig* is substantially similar to Pederson's draft complaint and Pederson's original and amended complaints in *Pederson v Frost I*.

155. Pederson initiated the *Pederson v Frost I* litigation in November of 2017 by serving Brian Keller under the Minnesota Rules of Civil Procedure (by "pocket service").

156. The Defendants removed the case to Federal court and filed a Motion to Dismiss.  One of the many grounds they offered in support of their motion to dismiss was that Pederson's allegations were implausible (citing *Twombley* and *Iqbal*), and that the court did not have to view the Plaintiff's allegations in a light most favorable to the Plaintiff.

157. Oral argument on the Defendant's Motion to Dismiss was held in Minnesota Federal District Court on May 29, 2018 before Magistrate Judge Becky Thorson.

158. At the time of the oral argument, Federal law enforcement officials had not taken any public enforcement actions against Frost gang members for securities fraud.

159. On July 11, 2018, Judge Thorson issued a Report and Recommendation (R&R) adopting the Defendants' argument that the Complaint should be dismissed based on lack of jurisdiction. The R&R relied heavily on the *Fastpath* case.

160. Pederson filed an Objection to the R&R on July 16, 2018.

161. On September 7, 2018, the SEC brought charges against 10 individuals and 10 entities for securities frauds at BioZone (now COCP) and two other companies (*SEC v Honig*). Frost was among the many Frost gang members charged with the frauds in *SEC v Honig*.

162. Around the time that the SEC filed *SEC v Honig*, numerous Frost gang members and associates resigned or were removed from positions at public companies and firms. These included:

a. September 20, 2017: "Phillip Frost has stepped down as chairman of Miami-based financial group Ladenburg Thalmann [LTS], a role he has held since 2006, the firm announced late Thursday. Earlier this month, Frost was named in a securities fraud complaint brought by the SEC. Frost has denied the allegations." https://www.miamiherald.com/latest-news/article218775485.html by Rob Wile.

b. "On August 29, 2018, Mr. Barry Honig notified Pershing Gold Corporation (the "Company") of his decision to resign as a member of the Board of Directors of the Company (the "Board"), effective immediately."

(SEC filing)

c. "Red Violet, Inc. (NASDAQ: RDVT), a leading information solutions provider, today announced that Executive Chairman Michael Brauser has resigned from the red violet Board of Directors, effective immediately."

(September 10 Business Wire news release)

d. " UPDATE 9.5.18 – Harvey Kesner's law firm has removed his name from the firm today. According to a member of the law firm this a clear signal that his fellow partners don't want to be associated with him or his ties to his biggest client Barry Honig."

(http://www.teribuhl.com/2018/08/29/kesners-out-why-is-barry-honigs-securities-lawyer-retiring/) by Teri Buhl.

e. "On August 28, 2018, Elliot M. Maza resigned all positions held by him with Immune Pharmaceuticals Inc. (the "Company") and its subsidiaries, including his positions as the Company's Chief Executive Officer and President and as a member of the Company's Board of Directors."

(https://marketexclusive.com/immune-pharmaceuticals-inc-nasdaqimnp-files-an-8-k-departure-of-directors-or-certain-officers-election-of-directors-appointment-of-certain-officers-compensatory-arrangements-of-certain-officer/2018/08/)

f.  COOL (now PTE) press release:  " Following the SEC's announcement on September 7, 2018 entitled, "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," the Company immediately terminated Mr. Stetson."

(https://www.marketwatch.com/press-release/polarityte-inc-issues-statement-regarding-mr-john-stetson-and-his-termination-from-the-company-2018-09-07)

g.  "Riot BlockChain CEO John O'Rourke is out, interim chief exec is named in wake of unrelated SEC charges" by Jennifer Schlessinger et al.

https://www.cnbc.com/2018/09/08/riot-blockchain-ceo-john-orourke-is-out-interim-ceo-is-named-in-wake-of-unrelated-sec-charges.html

163.  Judge Wilhelmina Wright dismissed pvf1 in an Order dated Sep 13, 2018, two days after the SEC filed *SEC v Honig*.

164.  Pederson filed a Notice of Appeal October 11, 20118.  The appeal is now pending at the 8th Circuit.

165.  From September 7, 2018 until the present, there have been numerous court filings in *SEC v Honig*.  The filings have included:

(a) a 100-page amended complaint detailing the P&D fraud at BZNE (now COCP),

(b) a consent to judgment by Frost, in which Frost agreed to pay a $5 million fine, and a total amount of about $5.6 million, and

(c) consents to judgment by other Frost gang members, associates, and entities including John Ford, Elliot Maza, Brian Keller, Mark Groussman, Opko Health, and Frost Gamma Investment Trust.

166. During the appeal of *Pederson v Frost I*, Pederson has brought multiple motions to supplement the record by judicial notice with court filings from the file of *SEC v Honig*.

167. According to the 8th Circuit Clerk of Court's office, *Pederson v Frost I* has been screened for oral argument and the earliest that oral arguments will be heard is October of 2019.

168. Since the filing of *SEC v Honig*, many other individuals and entities have sued Frost gang members, associates and entities for various frauds and torts related to pump and dump operations at Frost gang companies. Most of these cases are still in their early stages.

## VI. BATTLING A BILLIONAIRE (autobiographical section - written in the first person)

169.  The events described in this complaint illustrate some of the difficulties in obtaining justice against individuals who hold enormous financial wealth in this country.  The playing field is not level.

170.  I was 53 years old when I got sucked into the toxic environment of the Frost gang.  Now I am 61.  What should have been the most productive years of my career have been largely spent on trying to untangle a mass of frauds and lies created by Frost and his gang for the purpose of greed and with no regard to the people who got hurt along the way.

171.  The Frost gang is a huge, corrupt parasite on the American economy.  By printing stock (often with the SEC's approval), manipulating financial markets and playing games with corporate assets, they siphon off enough profits to incentivize their members and associates to continue their dishonest ways.  Because of minimal (oftentimes zero) regulatory oversight and often non-existent law enforcement, the Frost gang has been free to plunder and damage the economy for the better part of a decade.

172.  Battling the Frost gang has often been discouraging.  One low point came when SEC Whistleblower Chief Sean McKessy called to tell me that the Whistleblower Office would not take action on my complaints - even though the frauds described in the complaints were later prosecuted.  Another low point came during *Pederson v Frost I*, when attorneys for Frost and the other defendants

argued that my claims were implausible, and the court apparently believed them. Yet another low point was when both the SEC and Judge Ramos of the SDNY agreed to allow Frost to continue as CEO and Chairman of Opko as part of Frost's settlement with the SEC in *SEC v Honig*. Of course, still another low point forms the basis for this lawsuit - when Dan Fisher became so discouraged at fighting the Frost gang that he did a deal with them to enrich himself at my expense.

173. There have been some encouraging moments during my battle with a billionaire. So far, the highlight has been the SEC bringing charges against Frost gang members in *SEC v Honig*.

174. Another encouraging moment came on April 10, 2017, when the SEC filed suit against a stock promotion network similar to that used by the Frost gang: *SEC v CSIR Group et al*, SDNY, Case No. 17-cv-2541.

175. Many reports and exposés relating to the Frost gang have been written during the course of FrostZone and up until the present. Some have been written under pseudonyms. Certain of these articles were crucial in putting pressure on the SEC to file *SEC v Honig*. A partial list of the reports, articles and exposés follows, with the most crucial ones marked with asterisks.

(a) December 11, 2013: "The Placebo Effect" by Lakewood Capital*

(b) July 21, 2015: "IDI: Strong Sell On Fraud Lawsuits, Bankruptcy And Technology Failure, -92.4% Downside" by The Pumpstopper

(c)  February 19, 2016:  "TransEnterix: Watch for a 60% Crash After Stock Promotion and Disappointing Sales" by Bleecker Street Research (Chris Drose)

(d)  May 26, 2016:  "Microcap Attorney Jaclin's Co-Conspirator Turned DOJ Witness in Shell Factory Scheme" by Teri Buhl*

(e)  May 26, 2016:  Teri Buhl posted the Joseph Noel and Imran Husain Federal plea agreements on Scribd, showing that Barry Honig was involved in a P&D securities fraud at YesDTC.*

(f)  June 20, 2016:  "Pershing Gold and ChromaDex Exposed" by Bleecker Street Research. (Chris Drose)*

(g)  September 7, 2016:  "Microcap Attorney Jaclin fights SEC fraud case by Blaming Everyone Else" by Teri Buhl

(h)  September 23, 2016:  "MGT Capital Receives SEC Subpoena Seeking Information about Barry Honig and Eight Other Individuals" by Teri Buhl*

(i)  November 8, 2016:  "California DOJ investigating Honig and The Frost Group" by Teri Buhl*

(j)  February 9, 2017:  "Here it is: that MGT Capital SEC Subpoena" by Teri Buhl*

(k)  April 5, 2017:  "Honig and Friends Sue John McAfee because they didn't make enough money in MGT Capital deal" by Teri Buhl

(l)  June 5, 2017:  "Cogint (COGT, formerly IDI) insiders facing multiple SEC and DOJ investigations while promoters come under federal scrutiny" by Unemon

(m) June 7, 2017:  "This Hot Stock Needs Time To COOL" by Cliffside Research

(n) October 7, 2017: "PolarityTE: Investors Beware" by Hindenberg Research (Nate Anderson)

(o) November 9, 2017:  "Pershing Gold: We Believe the Shares are Virtually Worthless" by Hindenberg Research (Nate Anderson)

(p) November 17, 2017:  "Opko Health: A House of Cards Tumbling in the Dark" by Hindenberg Research (Nate Anderson)

(q) December 11, 2017:  "RIOT Blockchain:  Sudden Business Pivot, Suspicious Acquisitions, Questionable Special Dividend" by Hindenberg Research (Nate Anderson)*

(r ) December 13, 2017:  "Marathon Patent Group:  Bright Red Flags with this Newfangled 'Blockchain' Play" by Hindenberg Research (Nate Anderson)

(s) January 9, 2018:  "RIOT Blockchain:  This Crypto Clown Car Keeps Hurtling Towards the Abyss" by Hindenberg Research (Nate Anderson)

(t) January 31, 2018:  "Investor Who Rode Pivot from Biotech to Bitcoin Sells Big Stake" by Ianthe Jeanne Dugan in the *Wall Street Journal*\*

(u) February 16, 2018:  "CNBC investigates public company that changed its name to Riot Blockchain and saw its shares rocket" by Jennifer Schlessinger et al.

(v)  February 16, 2018:  "CNBC Investigates Barry Honig trading in Bitcoin Company $RIOT" by Teri Buhl

(w)  March 6, 2018:  "Pretenders and Ghosts: Stealth promotion network exploits financial sites to tout stocks" by Sharesleuth (Chris Carey)*

(x)  April 18, 2018:   "SEC issues subpoena to cryptocurrency company Riot Blockchain" by Scott Zamost et al.

(y)  July 12, 2018:  "Cool Mara Riot: The big money, bitcoin-biotech daisy chain" by Sharesleuth (Chris Carey)*

(z)  July 23, 2018:  "SkinTE and the FDA's 361 Pathway" by Ozgur Ogut*

(aa)  August 29, 2018:  "Kesner's Out: Why is Barry Honig's Securities Lawyer Retiring" by Teri Buhl*

(bb)  September 7, 2018:  "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes" SEC press release re *SEC v Honig*

(cc)  September 8, 2018:  "Unnamed Stocks in SEC fraud suit against Barry Honig Revealed" by Teri Buhl

(dd)  September 10, 2018:  "SEC Charges Against Phillip Frost Might Just Be the Tip of the Iceberg" by Bill Alpert in *Barron's*

(ee)  September 11, 2018:  "PolarityTE's Many Deceptions" by Research Noir*

(ff)  September 11, 2018:  "Opko Health: If These SEC Charges Were Surprising Then You Haven't Been Paying Attention" by Hindenberg Research (Nate Anderson)

(gg)  September 12, 2018:  "Laidlaw Execs helped Barry Honig Execute Stock Manipulation Scheme" by Teri Buhl*

(hh)  September 14, 2018:  "Is there a new Laidlaw-Honig Pharma Offering in Play?" by Teri Buhl

(ii)  September 21, 2018:  "Cool Holdings (AWSM):  Investors Should Give this Pump-and-Dump the Cold Shoulder" by the Streetsweeper (Sonya Colberg)*

(jj)  September 25, 2018:  "Cool Mara Riot, Part Two: Securities-fraud case against South Florida group reverberates through additional companies" by Sharesleuth (Chris Carey)*

(kk)  October 4, 2018:  "The Lawyer at the Center of SEC Pump-and-Dump Case" by Bill Alpert in *Barron's**

(ll)  October 31, 2018:  "Honig Deals lead to FINRA Investigation of Laidlaw & Co." by Teri Buhl

(mm)  January 4, 2019:  "Miami Billionaire Philip Frost Accused of Additional Financial Schemes in New Lawsuit" by Jerry Iannelli, *Miami New Times**

(nn)  February 4, 2019:  "Team Honig's Mark Groussman settles with SEC" by Teri Buhl

(oo) March 18, 2019: "Honig & Eloxx Pharma sued for stock fraud : $ELOX" by Teri Buhl

(pp) March 19, 2019: "Honig's broker dealer Laidlaw target of FBI investigation" by Teri Buhl*

(qq) March 26, 2019: "Honig's Puppet CEO Elliot Maza settles with the SEC" by Teri Buhl

(rr) April 11, 2019: "Hudson Bay Capital tied to Barry Honig Pump and Dump Ring : MabVax $MBVX" by Teri Buhl

(ss) April 14, 2019: "Andy & Catherine DeFrancesco Non-Related Party Transactions? : $AWSM CoolTech" by Teri Buhl

(tt) May 23, 2019: Updated Teri Buhl story about DOJ tolling agreements with the Frost gang*

176. Frost gang core member Barry Honig has sued business writer Chris Drose and journalist Teri Buhl (twice) in an effort to silence their reporting on the Frost gang's activities.

177. I filed various complaints and reports about the Frost gang with Federal law enforcement authorities before I teamed up with Fisher. A list follows.

(a) December 18, 2013: SEC Whistleblower ("WB") complaint against Frost, BZNE mailed to SEC, TCR1389304450989 (301)

(b) February 1, 2014: Supplement to TCR1389304450989 mailed to SEC (302)

(c) February 9, 2014:  Supplement to TCR1389304450989 mailed to SEC (303)

178.  Fisher and I filed various complaints and reports about the Frost gang with Federal law enforcement authorities ("LEAs" or "Feds") during the time I collaborated with Fisher.  The specific recipients of these letters and emails varied over time.  A list of the letters and emails follows.

(a)  July 24, 2014:  Letter to McKessy (304)

(b)  Aug 30, 2014:  Cc to Mckessy (305)

(c)  Aug 30, 2014:  Whistlleblower complaint filed against MSLP (306)

(d)  Sep 9, 2014:  Cc McKessy (307)

(e)  Sep 14, 2014:  Letter to McKessy (308)

(f)  Sep 16, 2014:  Cc McKessy (309)

(g)  Sep 26, 2014:  14-page letter to McKessy (310)

(h) Sep 29, 2014:  Letter to LEAs (311)

(i)  Sep 29, 2014:  10-pp Cc to LEAs (312)

(j)  Oct 4, 2014:  Letter to LEAs (313)

(k) Oct 5, 2014:  Letter to LEAs (314)

(l)  Oct 11, 2014:  Cc to LEAs (315)

(m)  Oct 21, 2014:  Email to LEAs (316)

(n)  Nov 1, 2014:  Letter to LEAs (317)

(o)  Nov 11, 2014:  Email to AUSA-1 (318)

(p) Nov 27, 2014:  FrostZone update to LEAs (319)

(q) Dec 1, 2014:  Letter to LEA (320)

(r ) Mar 11, 2015:  Cc to LEAs (321)

(s) Mar 14, 2015:  Cc to LEAs (322)

(t) Mar 23, 2015:  Letter to McKessy (323)

(u) Apr 24, 2015:  Email to LEAs (324)

(v) Apr 27, 2015:  Cc to LEAs (325)

(w) May 14, 2015:  Emails to SEC-3 and SEC-7 (326)

(x) May 28, 2015:  Letter to McKessy (327)

(y) May 31, 2015:  Email to SEC-7 (328)

(z) June 9, 2015:  letter to SEC employees (329)

(aa) July 19, 2015:  email to LEAs (330)

(bb) July 23, 2015:  email update to LEAs (331)

(cc) July 29, 2015:  email to Feds linking BZNE P&D, John Ford, and MGTI (20)

(dd) July 29, 2015:  email to LEAs (332)

(ee) July 30, 2015:  update email on MGTI P&D to Feds (334)

Note:  The SEC did not issue a subpoena to MGTI until September 15, 2016.

(ff) July 30, 2015:  Fisher email to SEC re illegal termination, with documentation

(335)

(gg) Aug 1, 2015:  emails to LEAs re illegal termination (336)

(hh)  Aug 17, 2015:  email to LEAs (337)

(ii)  Oct 12, 2015:  emails to SEC-1 (338)

(jj)  Oct 16, 2015:  email to SEC-1 (339)

(kk)  Oct 18, 2015:  email to AUSA-1, lots of cc's (340)

(ll)  Nov 8, 2015:  cc to SEC-4 (341)

(mm)  Nov 22, 2015:  email to SEC-1 (342)

(nn)  Nov 30, 2015:  email to SEC-1 (343)

(oo)  Dec 3, 2015:  email to SEC-1 (344)

(pp)  Dec 7, 2015:  Fisher's "white collar terrorists" letter to LEAs (345)

(qq)  Jan 3, 2016:  email to SEC-1 (346)

(rr)  Jan 11, 2016:  Fisher phone call and email to FBI-1 (347)

(ss)  Jan 25, 2016:  cc to SEC-1 (348)

(tt)  May 20, 2016:  "What are you waiting for?" email to AUSA-1 (349)

(uu)  Nov 13, 2016:  cc's to LEAs re statutes of limitations ("SOLs") (350)

(vv)  Nov 16, 2016:  cc's to LEAs (351)

(ww)  Nov 24, 2016:  "DOJ lost direction" email to LEAs (352)

(xx)  Dec 1, 2016:  email to AUSA-1 and AUSA-2 about SOL expiring in January

2017 (353)

(yy)  Dec 20, 2016:  COOL WB complaint filed (TCR1482269182922), cc's to

LEAs (354)

(zz) Jan 2, 2017:  email to Feds (355)

179.  I have filed various complaints and reports about the Frost gang with Federal law enforcement authorities after my collaboration with Fisher ended.  A partial list of the letters and emails follows.

(a) April 9, 2017:  email to SEC-1 (356)

(b) April 13. 2017:  emails to SEC-8 (357)

(c) April 21, 2017:  cc to SEC-1 (358)

(d) April 26, 2017:  draft complaint for *Pederson v Frost I* emailed to SEC-1 (359)

(e) May 1, 2017:  draft complaint for *Pederson v Frost I* emailed to AUSA-2 et al (360)

(f) May 5, 2017:  email to SEC Office of the Inspector General (OIG) requesting an investigation of SEC non-prosecution of the Frost gang (361)

(g) May 11, 2017:  email to SEC-1 (362)

(h) June 12, 2017:  email to AUSA-2 re YesDTC SOL (363)

(i) June 14, 2017:  email to LEAs (364)

(j) June 23, 2017:  email to LEAs (365)

(k) July 10, 2017:  email to LEAs re COOL and RICO (366)

(l) July 15, 2017:  email to LEAs (377)

(m) July 19, 2017:  email to LEAs re YesDTC SOL (378)

(n) Aug 1, 2017:  email to SEC-2 re YesDTC SOL (379)

(o)  Aug 5, 2017:  "new American kleptocracy" email cc'd to LEAs (380)

(p)  Aug 19, 2017:  email to SEC OIG (389)

(q)  Aug 21, 2017:  email to FBI-1 et al (390)

(r )  Aug 23, 2017:  cc to LEAs of first letter to Burdman at COOL (391)

(s)  Aug 31, 2017:  "enabling securities fraud" email to LEAs re COOL (392)

(t)  Sep 2, 2017:  email to LEAs (393)

(u)  Sep 25, 2017:  cc to LEAs of second letter to Burdman at COOL (394)

(v)  Sep 27, 2017:  email to LEAs and journalists (395)

(w)  Oct 3, 2017:  email to LEAs re COOL (396)

(x)  Oct 15, 2017:  complaint for *Pederson v Fisher I* emailed to LEAs (397)

(y)  Oct 18, 2017:  email to LEAs (398)

(z)  Oct 20, 2017:  cc to LEAs of third letter to Burdman at COOL (399)

(aa)  Oct 22, 2017:  email to LEAs (400)

(bb)  Oct 31, 2017:  cc to LEAs of fourth letter to Burdman at COOL (401)

(cc)  Nov 3, 2017:  email to LEAs (402)

(dd)  Nov 5/6, 2017:  cc to LEAs of fifth letter to Burdman at COOL (403)

(ee)  Nov 14, 2017:  email to LEAs (404)

(ff)  Nov 18, 2017:  cc to LEAs of sixth letter to Burdman at COOL (405)

(gg)  Nov 23, 2017:  cc to LEAs of email to Kesner (406)

(hh)  Nov 23, 2017:  email from Kesner forwarded to LEAs (407)

(ii)  Dec 8, 2017:  email to LEAs (408)

(jj)  Dec 12, 2017:  Frost gang methods email 1 to LEAs (409)

(kk)  Dec 13, 2017:  Frost gang methods email 2 to LEAs (410)

(ll)  Dec 30, 2017:  email to LEAs re Rule 26 disclosures in *Pederson v Frost I*

(411)

(mm)  Jan 3, 2018:  mailed USB drive with Rule 26 disclosures to SEC-1 (412)

(nn)  Jan 30, 2018:  email to Feds (413)

(oo)  Feb 21, 2018:  email to Feds re Chris Carey (414)

(pp)  Feb 26, 2018:  email to Feds (415)

(qq)  Feb 27, 2018:  email to Feds (416)

(rr)  Feb 28, 2018:  email to Feds (417)

(ss)  Mar 11, 2018:  cc to Feds of "for the record" email to Chris Carey (418)

(tt)  Mar 15, 2018:  email to Feds (419)

(uu)  Mar 20, 2018:  email to Feds (420)

(vv)  Mar 22, 2018:  email to Feds (421)

(ww)  Mar 27, 2018:  email to Feds (422)

(xx)  Mar 29, 2018:  email to Feds (423)

(yy)  Apr 12, 2018:  email to Feds (424)

(zz)  Apr 18, 2018:  LTS WB Complaint to LEAs, SEC WB Office (TCR 15246-

863-214) (425)

(aaa)  May 2, 2018:  email to LEAs re Laidlaw and Honig and Frost (426)

(bbb)  May 3, 2018:  email to SEC-1 (427)

(ccc)  May 14, 2018:  email to LEAs (428)

(ddd)  May 24, 2018:  email to LEAs (429)

(eee)  June 4, 2018:  email to LEAs (430)

(fff)  June 16, 2018:  email to LEAs (431)

(ggg)  July 11, 2018:  email to LEAs (432)

(hhh)  July 16, 2018:  email to LEAs (433)

(iii)  Aug 2, 2018:  cc to LEAs of seventh letter to Burdman at COOL (434)

(jjj)  Aug 2, 2018:  email to SEC-1 re MBVX (435)

(kkk)  Aug 4, 2018:  email to LEAs (436)

(lll)  Aug 8, 2018:  email to LEAs (437)

(mmm)  Aug 15, 2018:  Frost gang update to LEAs (438)

(nnn)  Aug 17, 2018:  SOL email to LEAs (439)

(ooo)  Sep 4, 2018:  email to LEAs (450)

(ppp)  Sep 9, 2018:  email to LEAs (451)

(qqq)  Sep 16, 2018:  "The Frost gang: A Vertically Integrated ..." report to LEAs. (452)

(rrr)  Sep 29, 2018:  Frost gang update sent to LEAs (453)

(sss)  Oct 4, 2018:  cc to LEAs (454)

(ttt)  Oct 5, 2018:  email to LEAs (455)

(uuu)  Oct 6, 2018:  email to LEAs (456)

(vvv)  Oct 7, 2018:  email to LEAs (457)

(www)  Oct 7, 2018:  email to SEC re MSLP SOL (458)

(xxx)  Oct 14, 2018:  cc to LEAs (459)

(yyy)  Oct 20, 2018:  email to LEAs (460)

(zzz)  Oct 28, 2018:  Version 2 of "The Frost gang: A Vertically Integrated …"
report to LEAs (461)

(aaaa)  Nov 1, 2018:  bcc to Feds (462)

(bbbb)  Nov 8, 2018:  email to LEAs (463)

(cccc)  Nov 9, 2018:  email to LEAs (464)

(dddd)  Nov 21, 2018:  email to LEAs (465)

(eeee)  Nov 26, 2018:  email to LEAs (466)

(ffff)  Nov 28, 2018:  email to LEAs (467)

(gggg)  Dec 15, 2018:  cc to LEAs of first letter to Baylor-Henry at COOL (468)

(hhhh)  Dec 23, 2018:  email to LEAs (469)

(iiii)  Dec 24, 2018:  cc to LEAs of second letter to Baylor-Henry at COOL (470)

(jjjj)  Dec 30, 2018:  open letter to Judge Ramos re Frost settlement, cc to LEAs
(471)

(kkkk)  Jan 1, 2019:  email to LEAs (472)

(llll)  Jan 13, 2019:  cc to LEAs of third letter to Baylor-Henry at COOL (473)

(mmmm)  Jan 19, 2019:  email to SEC-1 re Ebola (474)

(nnnn)  Jan 22, 2019:  cc to LEAs of fourth letter to Baylor-Henry at COOL (475)

(oooo)  Jan 30, 2019:  email to LEAs (476)

(pppp)  Feb 2, 2019:  email to LEAs (477)

(qqqq)  Feb 9, 2019:  cc to LEAs of fifth letter to Baylor-Henry at COOL (478)

(rrrr)  Feb 14, 2019:  email to SEC OIG (479)

(ssss)  Feb 16, 2019:  cc to LEAs of sixth letter to Baylor-Henry at COOL (480)

(tttt)  Feb 17, 2019:  email to LEAs (481)

(uuuu)  Feb 26, 2019:  email to SEC OIG (482)

(vvvv)  Mar 10, 2019:  email to LEAs (483)

(wwww)  Mar 15, 2019:  email to LEAs (484)

(xxxx)  April 28, 2019:  cc to LEAs of 7th letter to Baylor-Henry at PTE (485)

(yyyy)  June 8, 2019:  cc to LEAs of 8th letter to Baylor-Henry at PTE (486)

(zzzz)  June 9, 2019:  cc to LEAs of 9th letter to Baylor-Henry at PTE (487)

(aaaaa)  June 16, 2019:  cc to LEAs of letter to Maggie Dalton (488)

180.  The reason that Fisher and have I sent so much information to the Feds is that

there are so many Frost gang companies that showed red flags of being P&D

frauds.

181.  Most of my submissions to Federal regulatory authorities have gone unacknowledged.  Notable acknowledgements and communications from government agents (mostly excluding receipt letters from the SEC Whistleblower Office, empty responses to FOIA requests, and automatic out-of-the-office notifications) include:

(a)  October 1, 2014:  email from SEC-3 (601)

(b)  October 9, 2014: email from SEC-5 (602)

(c)  November 11, 2014:  email from AUSA-1 (603)

(d)  November 12, 2014:  voicemail from FBI-1 (604)

(e)  April 17, 2015/May 14, 2015:  letter from SEC Whistleblowers Office dated April 17, 2015 (605)  This letter assigned number TCR1429291515271 to my MSLP whistleblower complaint that had been filed August 30, 2014 (over four months earlier).  I had made repeated requests for acknowledgment of the WB complaint before receiving this letter.  Strangely enough, the letter was dated Apr 17, 2015, but was postmarked May 14, 2015.  MSLP had announced settlement of their SEC investigation on April 13, 2015.

(f)  June 1, 2015:  voicemail from SEC-6 (606)

(g)  June 3, 2015:  phone call with SEC-4 and SEC-6 (607)

(h)  June 8, 2015:  email from SEC-7 to Fisher (608)

(i)  Aug 24, 2015:  phone call from McKessy to Pederson

(j)  Oct 8 and 9, 2015:  emails from SEC-1 (609)

(k)  Nov 23, 2015:  email from SEC-1 (610)

(l)  Dec 23, 2015:  SEC subpoena to Fisher (Case No. SEC NY-09240) (611)

(m)  April 28, 2017:  email from SEC-1 re draft complaint for *Pederson v Frost I* (043)

(n)  Nov 6, 2017:  email from SEC Office of Investor Education re first letter to Burdman (613)

182.  Many of the reports, letters and emails I sent to LEAs were also sent to journalists, business writers, and other interested persons.  Generally, this correspondence was bcc'd to the LEAs in order to protect their individual identities.

183.  On or about May 5, 2017, I requested that the SEC Office of the Inspector General investigate the reasons and circumstances why the Office of the Whistleblower decided not to take action on my complaints, and the events and communications leading up to McKessy's phone call to me.

184.  I have repeatedly suggested to Federal law enforcement agents that they use the Federal RICO statute to prosecute the Frost gang.


VII.  INTENTIONALLY LEFT BLANK

## VIII.  CLAIMS

185.  Pederson brings claims against Frost for breach of fiduciary duty and tortious interference with a business relationship.  Pederson brings a claim against COCP for tortious interference with a business relationship.  Pederson brings claims against Fisher for unjust enrichment/ quasi-contract and quantum meruit.

### VIII.1.  Claim One:  against Frost for Breach of Fiduciary Duty at COCP.

186.  Plaintiff re-asserts all previous allegations in this complaint.

187.  Under Delaware law, directors owe both a duty of care and a duty of loyalty to the corporation's shareholders.  The duty of loyalty requires a director to act in good faith and in a manner it reasonably believes to be in the best interests of the corporation and its stockholders, and to avoid engaging in acts of self-dealing.

188.  On May 20, 2013, Pederson bought 100 shares of BZNE for a price of 55 cents per share.  Pederson was subsequently a shareholder of BZNE/COCP at all relevant times.

189.  Frost is a director at COCP and a major shareholder.  Frost also has and had influence over the BOD through two other Frost gang members who also are and were directors at COCP and other COCP BOD members who are associates of Frost.

190.  Frost had fiduciary duties to COCP's shareholders, including Pederson.

191.  Frost breached his duty to COCP by directing the use of COCP assets for his own personal purpose, i.e., to buy Dan Fisher's silence.

192.  Pederson and other shareholders were damaged by Frost's misuse of COCP's assets.

VIII.2.  Claim Two against Frost and COCP for tortious interference with a prospective economic advantage.

193.  Plaintiff re-asserts all previous allegations in this complaint.

194.  The test for a tortious interference with prospective economic (or business) advantage claim in Minnesota requires the plaintiff to show:

    1.  the existence of a reasonable expectation of economic advantage;

    2.  the defendant's knowledge of that expectation of economic advantage;

    3.  that defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of state or federal law;

    4.  in the absence of the wrongful act of the defendants, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and

CASE 0:19-cv-01777-JNE-DTS   Document 1   Filed 07/08/19   Page 71 of 75

5. the plaintiff sustained damages.

Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 844 N.W.2d 210, 219 (Minn. 2014).

195. Pederson and Fisher worked together against Frost and his gang to each achieve economic advantages.

196. Defendants Frost and COCP knew that Pederson and Fisher were working together against Frost and his gang to each achieve economic advantages.

197. Defendants Frost and COCP intentionally interfered with Pederson's reasonable expectation of economic advantage, the intentional interference was in violation of a state statute or regulation and/or the intentional interference was independently tortious (breach of duty to COCP).

198. Defendants intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference was in violation of applicable state law.

199. In the absence of the wrongful act of the Defendants, it is reasonably probable that Pederson would have realized his economic advantage or benefit (e.g., Fisher providing documents, declarations and testimony in support of Pederson's legal claims).

200. The plaintiff sustained damages (e.g., Pederson was deprived of Fisher's assistance in seeking justice against the Frost gang).

VIII.3.  Claim Three -   against Fisher for Quasi-Contract / Unjust Enrichment

201.  Plaintiff re-asserts all previous allegations in this complaint.

202.  Quasi-Contract / Unjust Enrichment in Minnesota:

> "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012). The elements of an unjust-enrichment claim are that: "(1) a benefit be conferred by the plaintiff on the defendant; (2) the defendant accept the benefit; (3) the defendant retain the benefit although retaining it without payment is inequitable." Zinter v. Univ. of Minn., 799 N.W.2d 243, 247 (Minn. App. 2011), review denied (Minn. Aug. 16, 2011). "[T]o prevail on a claim of unjust enrichment, a claimant must establish an implied-inlaw or quasi-contract in which the defendant received a benefit of value that unjustly enriched the defendant in a manner that is illegal or unlawful," Caldas, 820 N.W.2d at 838, or "morally wrong," Schumacher v. Schumacher, 627 N.W.2d 725, 729–30 (Minn. App. 2001).

203.  Pederson provided services to Fisher that provided leverage to Fisher in settling the Garcia Properties litigation.

204.  Fisher had a claim against COCP for $295,000.

205.  At some point, Fisher seriously considered settling the case for $175,000.

206.  Because of the benefits provided by Pederson, Fisher settled the case for about $800,000 more than the amount of his $295,000 claim.

VIII.4.  Claim Four - against Fisher for Quantum Meruit

207. Plaintiff re-asserts all previous allegations in this complaint.

208. A party may recover under quantum meruit where he or she has conferred a benefit to another and has not received reasonable compensation for this act. See, e.g., Frankson v. Design Space Int'l, 394 N.W.2d 140, 145 (Minn. 1986). Under quantum meruit, the measure of recovery for a partially completed project is "the reasonable value of the fraction of the project that was completed." E.C.I. Corp. v. G.G.C. Co., 306 Minn. 433, 437, 237 N.W.2d 627, 630 (Minn. 1976). Determination of the "reasonable value" can be based on the contract price, even though recovery is sought in equity. Confer Bros. v. Currier, 164 Minn. 207, 210, 204 N.W. 929, 931 (Minn. 1925).

209. Recovery in quantum meruit may be obtained where a benefit is conferred and knowingly accepted under such circumstances that would make it unjust to permit its retention without payment. Ylijarvi v. Brockphaler, 213 Minn. 385, 393 (1942) ; see generally 17 C.J.S. § 6, at 572–73 (1963 & Supp.1985). However, there can be no recovery in quantum meruit where a valid express contract between the parties exists. Breza v. Thaldorf, 276 Minn. 180, 183, 149 N.W.2d 276, 279 (1967); Schimmelpfennig v. Gaedke, 223 Minn. 542, 548, 27 N.W.2d 416, 420–21 (1947).

210. Pederson conferred a benefit to Fisher without receiving reasonable compensation.

211. The value of the benefit conferred was $800,000, or an amount to be determined at trial.

## IX.  PRAYER FOR RELIEF

212.  Pederson prays for declaratory relief that Frost breached his duty to COCP shareholders by using about $800,000 in corporate assets for his own personal purposes.

213.  Plaintiff Pederson prays for monetary damages in the amount of $800,000 (eight hundred thousand dollars) or an amount to be determined at trial, alternatively, jointly and severally, or as the court may apportion, for:

(a)  Quasi-contract/Unjust Enrichment and/or Quantum Meruit against Fisher, and/or

(b)  Tortious Interference with a prospective economic advantage against Frost and/or COCP.

Lee Pederson

74

Date: July 8, 2019                    Signed:  /s/ Lee Pederson
                                      Pro se
                                      MN Bar # 225605
                                      2126 Lyndale Ave S  #6
                                      Minneapolis, MN  55405
                                      952-836-7949
                                      leempete@aol.com